## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **LSP TRANSMISSION HOLDINGS, LLC** | Civil No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **LORI SWANSON**, Attorney General of the State of Minnesota; **NANCY LANGE**, Commissioner and Chair, Minnesota Public Utilities Commission; **DAN LIPSCHULTZ**, Commissioner, Minnesota Public Utilities Commission; **MATT SCHUERGER**, Commissioner, Minnesota Public Utilities Commission; **JOHN TUMA**, Commissioner, Minnesota Public Utilities Commission; **KATIE SIEBEN**, Commissioner, Minnesota Public Utilities Commission, and **MIKE ROTHMAN**, Commissioner, Minnesota Department of Commerce, each in his or her official capacity, | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff LSP Transmission Holdings, LLC ("LSP Transmission" or "Plaintiff") brings this action for Declaratory and Injunctive relief against Lori Swanson, the Attorney General of the State of Minnesota, the Commissioners of the Minnesota Public Utilities Commission, and Mike Rothman, the Commissioner of the Minnesota Department of Commerce, (collectively, "Defendants"), challenging the constitutionality of Minnesota Statute § 216B.246, which grants incumbent electric transmission owners the right of first refusal to construct electric transmission lines in the state of Minnesota.

1

Pursuant to 42 U.S.C. § 1983, Plaintiff seeks declaratory relief to invalidate Minnesota Statute § 216B.246 because it violates the Commerce Clause of the United States Constitution, and injunctive relief to prevent the unconstitutional enforcement of this law by Defendants.

## PARTIES

2.      Plaintiff LSP Transmission Holdings, LLC is a Delaware limited liability company with its principal place of business at 16150 Main Circle Drive, Suite 310, Chesterfield, MO, 63017.  LSP Transmission and its related entities develop and own electric transmission projects throughout the United States.

3.      Defendant Lori Swanson is the Attorney General of the State of Minnesota, and charged with enforcing the laws of the state of Minnesota.

4.      Defendant Commissioners of the Minnesota Public Utilities Commission ("PUC" or the "Commission") Nancy Lange, Dan Lipschultz, Matt Schuerger, John Tuma, and Katie Sieben are charged with the regulation of utilities doing business in the State of Minnesota.   The Minnesota Public Utilities Commission is responsible for granting certificates of need and route permits for large energy facilities, including transmission lines.  Minnesota Statute § 216B.246 requires incumbent electric transmission owners to notify the PUC of their intent to exercise their right to build a transmission line, whereupon the PUC initiates proceedings to approve the transmission line, and thus the Commissioners are engaged in implementing and enforcing this unconstitutional law.

5.      Defendant Mike Rothman is the Commissioner of the Minnesota Department of Commerce (the "Department").   The Minnesota Department of Commerce staff

conducts the environmental review for proposed electric transmission facilities, provides technical expertise, and submits recommendations to the Commission after analysis of siting and routing applications.[1]  The Commissioner is responsible for the enforcement of Chapter 216B.  *See* Minn. Stat. § 216A.07, subd. 2.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331.  Plaintiff asserts claims under 42 U.S.C. § 1983 and the Constitution of the United States.

7.      This Court has personal jurisdiction over Defendants because all Defendants are residents of Minnesota and regularly conduct business in Minnesota.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in Minnesota and a substantial part of the events giving rise to this claim have occurred in Minnesota.

## STATEMENT OF FACTS

**A.      For Decades, Federal Policy Has Sought To Break Up Local Monopolies and Foster Competition among Electric Transmission Providers.**

9.      In the early part of the 20th century, electric utilities typically acted as separate, local monopolies—vertically integrated firms that constructed and operated their own generation, transmission, and distribution facilities.  Consumers paid a single bundled rate for delivered electricity.  *See New York v. FERC*, 535 U.S. 1, 5 (2002).

---

[1] MN PUC, *Energy Facilities Permitting*, https://mn.gov/puc/permitting/#2 (last visited Sept. 29, 2017).

10.     Recognizing that interstate electric energy transmission and wholesale rates were a matter of federal public interest, Congress enacted the Federal Power Act in 1935, which granted the Federal Power Commission, later renamed the Federal Energy Regulatory Commission ("FERC"), the exclusive authority to regulate the transmission and sale of electricity at wholesale rates in interstate commerce.  Alexandra Klass, *Takings and Transmission*, 91 N.C. LAW REV. 1079, 1099 (2013).

11.     As a result, new, smaller electricity generators began to emerge to compete with the vertically integrated utilities.  Interconnected-electric systems and long-distance transmission became increasingly prevalent and economical.  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 50 (D.C. Cir. 2014).

12.     Finding that "the economic self-interest of electric transmission monopolists lay in denying transmission or offering it only on inferior terms to emerging competitors," *S.C. Pub. Serv. Auth.*, 762 F.3d at 50, FERC enacted a series of reforms to promote development of competitive markets.  In 1996, FERC promulgated Order No. 888, requiring each jurisdictional electric public transmission provider to unbundle its wholesale generation and transmission services.  Through this Order, FERC sought to open the electric grid to all sources of electric power.

13.     In 1999, FERC issued Order No. 2000, which encouraged the owners of electric transmission operating in interstate commerce to cede operation of their transmission systems to independent system operators ("ISOs") or regional transmission organizations ("RTOs") to coordinate transmission planning, operation, and use on a regional and interregional basis.

14.     ISOs are FERC-approved nongovernmental agencies that manage portions of the transmission grid and regional markets for wholesale power for much of the country. These entities also operate and plan the expansion of transmission grids within their regional footprints.  Alexandra Klass, *The Electric Grid at a Crossroads: A Regional Approach to Siting Transmission Lines,* 48 U.C. DAVIS LAW REV. 1895, 1936–37 (2015).

15.     An ISO's authority comes from its tariff, which must be approved by FERC and which governs the relationship between an ISO and its members.  An ISO's tariff lays out the terms on which members may participate in planning, building, expanding, and/or operating the electric transmission grids within their region.  A key role of an ISO is to plan for the development of new transmission lines to ensure the reliability of the system and provide access to electricity at reasonable costs.

16.     In the Midwest, the Midcontinent Independent System Operator ("MISO"), formerly the Midwest Independent System Operator, was created in 1998, and approved by FERC as the first ISO in 2001.  *North Dakota v. Heydinger*, 825 F.3d 912, 915 (8th Cir. 2016).  There are approximately 50 transmission owner-members in MISO,[2] and MISO has operational control over 49,000 miles of transmission lines that span 15 states, including Minnesota, and parts of Canada.  *North Dakota*, 825 F.3d at 915.

17.     Up until 2011, MISO's Agreement of Transmission Facilities Owners to Organize the Midwest Independent Transmission System operator, Inc. ("Transmission

---

[2] MISO, *Membership List*,
https://www.misoenergy.org/StakeholderCenter/Members/Pages/MembershipList.aspx
(last visited Sept. 29, 2017).

Owner's Agreement") and Open Access Transmission, Energy and Operating Reserve Markets Tariff  ("MISO Tariff" or "Tariff"), like the agreements or tariffs of many other ISOs, included provisions—referred to as rights of first refusal—through which incumbent utilities gave themselves the exclusive right to construct any new transmission facilities in their service areas, even if a third party proposed the particular project.  Accordingly, the majority of the transmission lines within the MISO administered region today are owned and operated by incumbent transmission companies that have an existing footprint in the region.

### B.      LSP Transmission and its Affiliates are Competitive Players in the Transmission Development Market.

18.     LSP Transmission and its affiliates have a long history of active development of new electric transmission solutions.

19.     Currently, LSP Transmission and its affiliates own approximately 500 miles of transmission lines operating in two states, are developing transmission projects in six additional states, and have participated in numerous transmission planning and development processes across the country.  LSP Transmission affiliate Cross Texas Transmission, LLC is a public utility in Texas, and LSP Transmission affiliate Republic Transmission, LLC is a public utility in Indiana.

20.     LSP Transmission and its affiliates have been actively involved in MISO since 2009.  At that time, MISO and its transmission owners claimed the exclusive right to build all transmission projects planned by MISO under the right of first refusal provision in the MISO Tariff.  Nonetheless, whenever permitted to do so, LSP Transmission affiliates

have developed transmission projects, or competed to develop transmission projects, to address transmission needs.

**C.  In Order No. 1000, FERC Further Encouraged Competition By Eliminating Rights of First Refusal and Increasing Transparency in Project and Developer Selection.**

21.    In July 2011, the Federal Energy Regulatory Commission issued Order No. 1000, which, among other things, required the removal from FERC-approved tariffs and agreements of any provision granting a right of first refusal for certain new transmission facilities.  Based on their inclusion in agreements or tariffs subject to federal jurisdiction, Order No. 1000 referred to the provisions as "federal" rights of first refusal.  Since then, federal courts have rebuffed numerous challenges to Order No. 1000, not only upholding FERC's authority to eliminate rights of first refusal, but also recognizing in no uncertain terms that rights of first refusal impede competition and harm the public interest.

22.    Order No. 1000:  (1) seeks to foster competition; (2) sets certain standards for regional cost allocation; (3) takes federal rights of first refusal away from incumbents; (4) requires identification of the most cost effective projects; (5) requires—with exceptions—competition to select the developer for projects selected for regional cost allocation; and (6) charges ISOs and RTOs with implementation.  *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 136 FERC ¶ 61,051 (July 21, 2011) (hereinafter "Order No. 1000").

23.    FERC found that these reforms were needed to ensure that Commission-jurisdictional services continued to be offered at "rates, terms and conditions that are just and reasonable and not unduly discriminatory or preferential."  Order No. 1000 at ¶ 30.

24.     In particular, FERC found that rights of first refusal discouraged non-incumbent transmission developers seeking to invest in transmission, because the non-incumbent would likely not want to risk the significant investment necessary to develop a transmission project if it would simply have to hand over the project to an incumbent exercising its right of first refusal once the benefits of the project became known.  *Id.* at ¶ 257.

25.     FERC concluded in Order No. 1000 that:

> [L]eaving federal rights of first refusal in place for these facilities would allow practices that have the potential to undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs, which in turn can result in rates for Commission-jurisdictional services that are unjust and unreasonable or otherwise result in undue discrimination by public utility transmission providers

*Id.* at ¶ 7.

26.     FERC further found that "federal rights of first refusal in favor of incumbent transmission providers deprive customers of the benefits of competition in transmission development, and associated potential savings."  *Id.* at ¶ 285.

27.     Order No. 1000 catalogued the numerous comments that supported the removal of rights of first refusal.  For example:

a.  The Federal Trade Commission stated that the existence of a federal right of first refusal reduces capital investment opportunities for potential non-incumbent developers by increasing their risk, encourages free ridership among incumbent developers, and creates a barrier to entry.  *Id.* at ¶ 231.

b. Numerous state utility commission and consumer advocate groups agreed that the right of first refusal provisions impede transmission development and removing the provisions would provide a more level playing field for incumbent and non-incumbent transmission developers. *Id.* at ¶ 231.

28. Conversely, numerous incumbent transmission owners, including the MISO transmission owners,[3] opposed Order No. 1000 and its efforts to benefit ratepayers through transmission planning reform and competition. *Id.* at ¶¶ 239–40. Many of these incumbent transmission owners asserted that Order No. 1000 would conflict with state law requirements, including obligations to serve retail customers, which the incumbent transmission owners claimed dictated what transmission facilities should be built and where they should be built. *Id.* at ¶¶ 248, 276–77. Accordingly, FERC clarified that its focus was on the detrimental impact of rights of first refusal on rates subject to federal jurisdiction and that "nothing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities." *Id.* at ¶ 287.

29. In *S.C. Pub. Serv. Auth. v. FERC*, the D.C. Circuit affirmed FERC's authority to order removal of federal rights of first refusal from tariff agreements under Section 206 of the Federal Power Act, and found:

> [B]asic economic principles make clear that the rights of first refusal are likely to have a direct effect on the costs of transmission facilities because they erect a barrier to entry:

---

[3] *See* Order No. 1000, App. B, at 593 (listing MISO transmission owners).

namely, non-incumbents are unlikely to participate in the transmission development market because they will rarely be able to enjoy the fruits of their efforts.

762 F.3d at 75. LSP Transmission and its affiliate LS Power Transmission, LLC ("LS Power") intervened in the petitions for review[4] siding with FERC and Order No. 1000. FERC ceded some of its argument time to LS Power, the only party to whom FERC ceded argument time, to present the perspective of a non-incumbent transmission developer in defense of Order No. 1000.

30.     In upholding Order No. 1000, the court discussed the benefits of competition, relying on examples provided by LS Power of non-incumbent developers submitting substantially lower cost estimates for transmission projects than incumbents, including an example from LS Power's "own experience in proposing a transmission project" in MISO with "nearly half" the per-mile estimated cost of the incumbent developer. *Id.* at 69.

31.     The court found that the Commission was free to rest its ban on rights of first refusal on competition theory, and to determine that "rights of first refusal posed a barrier to entry that made the transmission market inefficient, that transmission facilities would therefore be developed at higher-than-necessary cost, and that those amplified costs would be passed on to transmission customers." *Id.* at 77.

32.     In Order No. 1000-A, FERC rejected rehearing requests based on transmission owner assertions of a protected contractual right to build all new transmission

---

[4] There were 43 petitions for review of Order No. 1000, including a petition by the MISO Transmission Owners, seeking to overturn Order No. 1000, with the MISO Transmission Owners focused on FERC's removal of the right of first refusal.

in an existing footprint, deferring ruling on such assertions to the regional compliance filings. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 139 FERC ¶ 61,132, at ¶¶ 388–389 (May 17, 2012) (hereinafter "Order No. 1000-A").[5]  As a result, numerous transmission owners made assertions of a contractually protected federal right to exclusively build new transmission in a particular region.

33.     FERC rejected each of these assertions leading to multiple follow-up appeals challenging FERC's rejection of the asserted protected contractual right.

a.     In *Oklahoma Gas & Electric Co. v. FERC*, 827 F.3d 75, 80 (D.C. Cir. 2016), the court upheld FERC's refusal to apply the *Mobile-Sierra*[6] presumption to a right of first refusal provision in the Southwest Power Pool, Inc. region, finding that "terms arrived at by horizontal competitors with a common interest to exclude any future competition" are not subject to such protection.  *Okla. Gas & Elec. Co.*, 827 F.3d at 80.

b.     In *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017), the court reached the same result, finding that FERC did not err in concluding

---

[5]  FERC also issued Order No. 1000-B affirming the requirements of Order 1000. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 141 FERC ¶ 61,044 (Oct. 18, 2012).

[6]  The *Mobile-Sierra* doctrine "presumes that freely-negotiated wholesale-energy contracts are just and reasonable unless found to seriously harm the public interest." *S.C. Pub. Service Auth.*, 762 F.3d at 81 (citing *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 167 (2010)).

that the right of first refusal must be removed from the ISO New England Transmission Operating Agreement because maintaining such rights would adversely affect transmission development and were not in the public interest.  *Id.* at 671–72.

c.     The U.S. Court of Appeals for the Seventh Circuit upheld FERC's abrogation of the right of first refusal in the MISO Transmission Owners Agreement, finding that the transmission owners had "made no effort to show that the right is in the public interest," and therefore subject to protection.  *MISO Transmission Owners v. FERC*, 819 F.3d 329, 333 (7th Cir. 2016), *cert. denied* 127 S. Ct. 1223 (2017).

34.     Thus, numerous federal courts have not only upheld FERC's authority to order the removal of rights of first refusal in FERC-approved tariffs and agreements, but recognized in no uncertain terms that rights of first refusal impede competition and harm the public interest.

**D.     Plaintiff Aggressively and Successfully Pursued Competitive Opportunities Opened Up by Order No. 1000.**

35.     Following regional implementation, LSP Transmission affiliates qualified as transmission developers in transmission planning regions administered by ISO New England, New York Independent System Operator, PJM Interconnection, L.L.C. ("PJM"), Southwest Power Pool, Florida Reliability Coordinating Counsel, MISO, Northern Tier Transmission Group, WestConnect, and the California Independent System Operator ("CAISO").   In three competitive solicitations held since Order No. 1000 became

effective,[7] affiliates of LSP Transmission were selected as the more efficient or cost-effective transmission developer for needed transmission additions. The selected LSP Transmission affiliates' proposals occurred in in PJM, CAISO, and MISO. Each of the LSP Transmission affiliates' successful proposals contained binding cost caps and multiple other cost reduction factors beneficial to ratepayers.

36.     In the MISO region, the only project up for competitive solicitation since the effective date of Order No. 1000 has been the Duff-Coleman EHV 345 kV Transmission Project, which will run from southern Indiana to western Kentucky.

37.     In 2016, LSP Transmission's subsidiary, Republic Transmission was selected to develop the Duff-Coleman project. MISO selected Republic Transmission's proposal as providing the greatest overall value out of eleven comprehensive proposals, including proposals from major utilities such as ITC Midcontinent Development and Xcel Energy, affiliates of Minnesota transmission owners.[8]

38.     LSP Transmission's wholly owned subsidiary Verdant Plains Electric, LLC is qualified in MISO to compete for all transmission projects subject to MISO's competitive solicitation process.

---

[7] Although Order No. 1000 established a date for the submission of required compliance filings, each planning region proposed its own effective date for those Order No. 1000 compliant provisions. As a result, a limited number of competitive solicitations have been held under the Order No. 1000 compliant competitive process.

[8] *See* MISO, *Duff-Coleman EHV 345 kV Selection Report*, (Dec. 20, 2016), *available at* https://www.misoenergy.org/Library/Repository/Study/Transmission%20Developer/2016 1220_FINAL_Selection%20Report_SRPT_v1.pdf.

39.     Thus, LSP Transmission and its affiliates have shown that they are willing, capable, and competitive players in the transmission development field and that they consistently deliver significant benefits to ratepayers when given the opportunity to compete, as compared to transmission projects where incumbent transmission owners are assigned the project without competition.

E.     **MISO's Response to Order No. 1000.**

40.     As noted above, the incumbent MISO transmission owners asserted that their right of first refusal provision was contractual and therefore protected from FERC removal. However, in compliance with Order No. 1000-A, MISO filed revisions to the Transmission Owner Agreement and its Open Access Tariff to remove right of first refusal provisions. MISO also created a competitive solicitation process to select the developer for regionally cost allocated projects.

41.     MISO's competitive solicitation process governed regionally cost allocated transmission projects categorized as either Market Efficiency Projects or Multi Value Projects.

42.     Multi Value Projects seek to support a range of public policies (such as promoting renewable energy) and/or provide widespread reliability, public policy, and economic benefits across the MISO footprint.[9]  Thus, the costs of Multi-Value Projects are 100 percent allocated system-wide.

---

[9] MISO, *MISO Transmission Expansion Planning*, https://www.misoenergy.org/Planning/TransmissionExpansionPlanning/Pages/TransmissionExpansionPlanning.aspx (last visited Sept. 29, 2017).

43.    Market Efficiency Projects seek to reduce market congestion.  They are eligible for approval when benefits are 1.25 times project costs.  Under the MISO Tariff, 80 percent of the costs of Market Efficiency Projects are distributed to local resource zones commensurate with the expected benefit, and the remaining 20 percent are allocated system-wide.

44.    Thus, through these cost allocation mechanisms, costs of even an intra-state project may be allocated across all or a substantial part of the MISO region.

45.    At the same time it removed the right of first refusal in its Tariff and created a competitive bidding process, MISO added language to its Tariff to recognize state-created rights of first refusal.  The MISO Tariff reads:

> **State or Local Rights of First Refusal.**  The Transmission Provider shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner.   The Transmission Owner will be assigned any transmission project within the scope, and in accordance with such terms, of any Applicable Laws and Regulations granting such a right of first refusal.  These Applicable Laws and Regulations include, but are not limited to, those granting a right of first refusal to the incumbent Transmission Owner(s) or governing the use of existing developed and undeveloped right of way held by an incumbent utility.[10]

46.    In ruling on MISO's Compliance Filings, after initially rejecting MISO's Tariff addition to recognize state laws, FERC ultimately decided to permit MISO to bind itself by state or local laws or regulations when deciding whether MISO would apply its

---

[10] MISO, *FERC Electric Tariff*, Attachment FF (Transmission Expansion Planning Protocol) (55.0.0), *available at* https://www.misoenergy.org/Library/Tariff/Pages/Tariff.aspx.

competitive solicitation process for transmission facilities.  *Order on Rehearing and Compliance Filings*, 150 FERC ¶ 61,037, at ¶ 25 (Jan 22, 2015).

47.    FERC found that it would be inefficient for MISO to have to consider competitive proposals for projects, if, under state and local laws, the project would be automatically assigned to the incumbent.  *Id.* at ¶ 26.

48.    However, the then-Chair of FERC, Norman Bay, filed a concurring opinion, in which he questioned the constitutionality of the state rights of first refusal:

> I write separately to note that the Constitution limits the ability of states to erect barriers to interstate commerce.  State laws that discriminate against interstate commerce—that protect or favor in-state enterprise at the expense of out-of-state competition—may run afoul of the dormant commerce clause.  The Commission's order today does not determine the constitutionality of any particular state right-of-first refusal law.  That determination, if it is made, lies with a different forum, whether state or federal court.

**F.    In Response to Order No. 1000, Minnesota Passed a Right of First Refusal Law, Eliminating Competition for In-State Projects**

49.    In the wake of Order No. 1000's elimination of rights of first refusal in tariffs and agreements subject to federal jurisdiction, while MISO was preparing its Order No. 1000 compliance filing for submission to FERC, Minnesota enacted a state statute creating a right of first refusal to protect its incumbent utilities from being required to compete with out-of-state developers, such as Plaintiff, for regionally cost allocated projects located in Minnesota.

50.    In early 2012, lawmakers in the Minnesota House and Senate introduced legislation to grant a right of first refusal to incumbent utilities in Minnesota that would

effectively replace the MISO-Tariff based right of first refusal eliminated by Order No. 1000.

51.     House File 1989, authored by Representative Hackbarth, was summarized as follows:  "House File 1989 establishes a right of first refusal for Minnesota utilities and electric transmission owners regarding the construction and ownership of electric transmission lines connecting to their own facilities."[11]

52.     Senator Brown introduced substantially similar legislation in the Minnesota Senate.  A hearing was held on Tuesday, March 20, 2012, in the Senate.

53.     Those testifying in support of the bill included representatives from Xcel Energy (the single largest incumbent transmission owner in Minnesota via its subsidiary, *see infra* ¶ 64(l)), who argued that elimination of the incumbents' right of first refusal would remove local control over transmission projects, and shift "critical decisions" to the federal government.  Xcel described the bill as "simply [giving] Minnesota utilities the first opportunity to invest in federal regionally planned transmission facilities" and stated that the bill was intended to "preserve the status quo."

54.     Those testifying against the bill included a representative from Plaintiff LSP Transmission, Sharon Segner.

55.     Ms. Segner testified that rights of first refusal create barriers to entry by discouraging LSP Transmission from participating in the transmission planning process, because even if LSP Transmission proposed a viable project, the incumbent would have

---

[11] *See* H.F. 1989, House Research Bill Summary, Feb 15, 2012, *available at* http://www.house.leg.state.mn.us/hrd/bs/87/HF1989.pdf.

the first chance to build the project.  Ms. Segner further testified that removal of right of first refusal provisions benefit consumers by promoting competition that often takes the form of new entrants in the market.  Ms. Segner also testified that there was no evidence that removal of rights of first refusal harmed consumers.

56.     Ultimately, the bill passed the Senate Committee unanimously, and was subsequently passed by the full Senate on March 27, 2012, and the House on March 29, 2012, and signed into law by the Governor on April 18, 2012.

57.     The statute, codified as Minn. Stat. § 216B.246, defines "incumbent electric transmission owner" as:

> Any public utility that owns, operates, and maintains an electric transmission line in this state; any generation and transmission cooperative electric association; any municipal power agency; any power district; any municipal utility; or any transmission company as defined under section 216.02, subdivision 10.

58.     The statute states:

> An incumbent electric transmission owner has the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan and connects to facilities owned by that incumbent transmission owner.

If the line connects facilities owned by to two different transmission owners, the right is shared individually and proportionally between the incumbents Minn. Stat. § 216.246, subd. 2.

59.     The statute also lays out the procedure by which an incumbent electric transmission owner exercises its rights:

> If an electric transmission line has been approved for construction in a federally registered planning authority transmission plan, the incumbent electric transmission owner, or owners if there is more than one owner, shall give notice to the commission, in writing, within 90 days of approval, regarding its intent to construct, own, and maintain the electric transmission line.

If the incumbent gives notice of its intent to build, it must subsequently file an application for a certificate of need. Minn. Stat. § 216.246, subd. 3(a).

60.    If the incumbent electric transmission owner indicates that it does not intend to build the line, it must explain to the PUC the basis for that decision. At that point, the PUC may determine whether it will nevertheless require the incumbent electric transmission owner to build the line. Minn. Stat. § 216.246, subd. 3(b). The PUC has the authority under Minn. Stat. § 216B.79 to require the incumbent to build the line.

61.    If the incumbent decides not to build *and* the PUC does not require the incumbent to build, only then it is possible that other entities would have a chance to build the line. However, as Ms. Segner also testified, it is unlikely that an incumbent would decline to exercise its right, particularly when the planning process has demonstrated the advantages of the project. Furthermore, the incumbent will be able to recover the costs of building the project, and will receive regulated rates of return, which are financially beneficial to the company.

62.    The statute, therefore, limits the right to build MISO-approved transmission lines in Minnesota to those entities that already have a Minnesota footprint, and excludes any non-incumbents from building these lines.

63.     Three different types of entities currently control transmission facilities in Minnesota: investor-owned electric utilities, electric cooperatives, and municipal utilities.

64.     The following utilities are owners of high-voltage transmission lines in the state of Minnesota:[12]

a.     American Transmission Company, LLC, headquartered in Wisconsin, is a transmission-only utility and owns 12 miles of transmission line in Minnesota.

b.     Dairyland Power Cooperative, headquartered in Wisconsin, is a generation and transmission cooperative, and owns approximately 571 miles of transmission line in Minnesota.

c.     East River Electric Power Cooperative, headquartered in South Dakota, is a generation and transmission cooperative, and owns approximately 213 miles of transmission line in Minnesota in nine counties in western Minnesota.

d.     Great River Energy, headquartered in Minnesota, is a generation and transmission cooperative, and owns approximately 4,696 miles of transmission line in Minnesota.

---

[12] *2015 Biennial Transmission Projects Report*, MPUC Dkt. No. E999/M-15-439, at 121-136 (Oct. 30, 2015), *available at* https://www.leg.state.mn.us/docs/2015/mandated/151162.pdf.

e.     Hutchinson Utilities Commission, headquartered in Minnesota, is a municipal utility, and owns approximately 17 miles of transmission line in Minnesota.

f.     ITC Midwest LLC, headquartered in Minnesota, is an independent transmission company subsidiary of ITC Holdings, Corp., and owns approximately 1,023 miles of transmission line in Minnesota.

g.     L&O Power Cooperative, headquartered in Iowa, is a generation and transmission cooperative, and owns approximately 53 miles of transmission line in Minnesota.

h.     Marshall Municipal Utilities, headquartered in Minnesota, is a municipal utility, and owns approximately 18 miles of transmission line in Minnesota.

i.     Minnesota Power, headquartered in Minnesota, is an investor-owned utility, and owns approximately 2,218 miles of transmission line in Minnesota.

j.     Minnkota Power Cooperative, headquartered in North Dakota, is a generation and transmission cooperative, and owns approximately 1,410 miles of transmission line in Minnesota.

k.     Missouri River Energy Services, is an association of municipally-owned electric utilities in Iowa, Minnesota, South and North Dakota, including 23 municipalities in Minnesota, and owns approximately 223 miles of transmission line in Minnesota.

l.    Northern States Power Company, is the wholly owned subsidiary of Xcel Energy, an investor-owned utility headquartered in Minnesota, and owns approximately 5,302 miles of transmission line in Minnesota.

m.    Otter Tail Power Company, headquartered in Minnesota, is an investor-owned utility, and owns approximately 2,362 miles of transmission line in Minnesota.

n.    Rochester Public Utilities, headquartered in Minnesota, is a municipal utility, and owns approximately 42 miles of transmission line in Minnesota.

o.    Southern Minnesota Municipal Power Agency, headquartered in Minnesota, is a municipal corporation made up of 18 municipal-owned utilities, and owns approximately 291 miles of transmission line in Minnesota.

p.    Willmar Municipal Utilities, headquartered in Minnesota, is a municipal utility, and owns approximately 37 miles of transmission line in Minnesota.

65.    In total, these entities own 18,460 miles of transmission line in Minnesota.

66.    The eleven transmission owners headquartered in Minnesota own 16,229 miles, or 87 percent, of transmission line in Minnesota.

67.    The largest transmission line owners are Northern States Power (Xcel Energy), with 5,302 miles, Great River with 4,696 miles, Otter Tail with 2,362 miles, and

Minnesota Power, with 2,218 miles.  These four entities together own 79 percent of transmission line assets in Minnesota.

68.    Minnesota's right of first refusal law protects these incumbent utilities from competition from out-of-state developers for the right to develop transmission lines approved through a federally-mandated planning process, and protects their ability to recover their costs of building transmission lines and to receive regulated rates of return.

### G.    Pursuant to the Minnesota Right of First Refusal Law, MISO Denies LSP Transmission Any Opportunity to Compete for the Huntley-Wilmarth Project.

69.    On December 8, 2016, MISO approved the MISO Transmission Expansion Plan 2016 (MTEP16), which included a project called the Huntley-Wilmarth transmission line project.

70.    The 40-mile transmission line as proposed will connect Xcel Energy's existing Wilmarth Substation north of Mankato, Minnesota, and a proposed Huntley Substation south of Winnebago, Minnesota, which will be owned by ITC Midwest, LLC.

71.    MISO designated the project as a Market Efficiency Project, which would normally be subject to MISO's competitive solicitation process, but found that the project "was not eligible for the MISO Competitive Developer Selector Process due to the applicability of Minnesota Statute § 216B.246, which assigns the authority for selecting developers to the state."[13]

---

[13]  MISO, *MTEP16 MISO Transmission Expansion Plan*, at 7, *available at* https://www.misoenergy.org/Library/Repository/Study/MTEP/MTEP16/MTEP16%20Full%20Report.pdf.

72.     The in-service date of the project is January 1, 2022.[14]

73.     Numerous MISO-qualified transmission developers, including LSP Transmission's subsidiary Republic Transmission, LLC, wrote to the Vice President and General Counsel of MISO asking him to reconsider the determination that the project was ineligible for MISO's competitive solicitation process.

74.     MISO's response letter stated:

> According to the Minnesota PUC staff and counsel, the Minnesota ROFR [Right of First Refusal] statute grants the incumbent transmission owner an option to build. . . . The Minnesota PUC staff and counsel have provided guidance that the ROFR statute would apply if the Huntley-Wilmarth 345kV transmission project were included in the MTEP 2016 portfolio.

75.     On March 3, 2017, the incumbents, Xcel Energy and ITC Midwest, submitted a notice to the Public Utilities Commission pursuant to § 216B.246, subd. 3(a) of their intent to construct, own, and maintain the Huntley-Wilmarth transmission line project.

76.     As proven by selection of the proposal of LSP Transmission's affiliate to develop the Duff-Coleman project in the MISO region, as well as other competitive solicitations won under Order No. 1000 by LSP Transmission and its affiliates, LSP Transmission has the necessary resources, technical capabilities, and intent to advance transmission projects in MISO, including projects such as the Huntley-Wilmarth transmission line project in Minnesota.

---

[14] *Id.* at App. AB.

77.    However, because of Minnesota's Right of First Refusal Law, LSP Transmission, its affiliates, and other out-of-state market participants are effectively barred from constructing transmission projects in Minnesota approved through federally mandated planning processes, and thus are directly harmed by the application and enforcement of this statute.

78.    The Minnesota statute is currently causing hardship to LSP Transmission and its affiliates by interfering with their ability to plan, invest in, and conduct their business operations as qualified MISO entities.

## COUNT I
## MINNESOTA'S RIGHT OF FIRST REFUSAL LAW VIOLATES THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983 and 42 U.S.C. § 1988

79.    Plaintiff realleges paragraphs 1 through 78 of this Complaint as though fully set forth herein.

80.    The United States Constitution provides that Congress shall have the power "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.

81.    The Commerce Clause includes a "dormant" limitation on the authority of the States to enact legislation affecting interstate commerce.

82.    The doctrine "is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competition."  *Department of Revenue v. Davis*, 555 U.S. 328, 337–38 (2008).

83.    A state statute that discriminates against interstate commerce in favor of in-state commerce is unconstitutional.

84.    The state of Minnesota is regulating activities in the interstate market, because it is applying the right of first refusal to projects approved through a federally mandated-planning process.   In addition, projects such as the Huntley-Wilmarth transmission line, are Market Efficiency Projects, and are thus eligible for regional (i.e. multi-state) cost allocation, even though the footprint of the project does not cross state lines.

85.    Minnesota Statute § 216B.246 facially discriminates against interstate commerce in favor of in-state commerce by giving incumbent utilities with an existing footprint in Minnesota the exclusive right of first refusal to build transmission lines approved through a federally-mandated planning process.

86.    Minnesota Statute § 216B.246 facially discriminates against Plaintiff by effectively prohibiting Plaintiff and other out-of-state market participants from building transmission lines in the state of Minnesota approved through a federally-mandated planning process.

87.    Minnesota Statute § 216B.246 discriminates in purpose and effect by protecting transmission developers with a Minnesota footprint from competition from out-of-state developers for transmission projects approved through a federally-mandated planning process.   Data shows that five Minnesota-based transmission owners control nearly 80% of all transmission lines in Minnesota, and this statute was intended to protect those owners from competition.

88.    The legislative history shows that the law was not enacted for a legitimate, non-protectionist purpose.

89.     Many other methods would allay any concerns regarding cost and reliability of service, such as requiring a non-incumbent to become a public utility and imposing other permit obligations on the non-incumbent to ensure reliability of service.

90.     Thus, the burden on interstate commerce caused by Minnesota Statute § 216B.246 is not justified by valid public welfare, consumer protection, or other legitimate public purpose unrelated to economic protectionism.  *See Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995).

91.     In addition, Minnesota Statute § 216B.246 unduly burdens interstate commerce by restricting entry to the transmission market in Minnesota, thus walling off the state from new market participants.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

92.     The purported local benefits of the Statute are insignificant and illusory, and are a mere pretext for discrimination against non-incumbent transmission developers.  As numerous courts have found, basic economic theory leads to the conclusion that competition benefits the markets and consumers.  Accordingly, the burden on interstate commerce is clearly excessive in relation to any purported local benefits.  *Cotto Waxo*, 46 F.3d at 793.

93.     Minnesota is not a market participant in any field related to the Statute.

94.     The provision granting the right of first refusal to incumbent utilities is not severable from the statute.

95.     The statute has injured Plaintiff and its affiliates by preventing their entry to the Minnesota transmission-development marketplace, and interfering with their ability to plan, invest in, and conduct their business operations as MISO-qualified entities.

96.     This unconstitutional legislation, as enacted and as applied, should be stricken as unconstitutional and/or its enforcement should be enjoined as it threatens Plaintiff with irreparable injury for which there is no adequate remedy at law.  Plaintiff also seeks attorney's fees pursuant to 42 U.S.C. § 1988.

**COUNT II**
**DECLARATORY RELIEF**
**28 U.S.C. § 2201**

97.     Plaintiff realleges paragraphs 1 through 96 of this Complaint as though fully set forth herein.

98.     "In a case of actual controversy . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

99.     Minnesota Statute § 216B.246 violates the Dormant Commerce Clause because it discriminates on its face and in purpose and effect against interstate commerce in order to benefit in-state competitors.

100.    The statute was enacted for purely protectionist purposes, and there are no local benefits that justify the continued enforcement of the statute.

101.    Enforcement of this law creates a genuine, credible, and immediate threat of harm to Plaintiff's business and interstate commerce, by preventing new transmission development entities from entering the Minnesota market.

102.    Plaintiff seeks a declaration that Minn. Stat. § 216B.246 is void under the Dormant Commerce Clause of the United States Constitution.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff hereby respectfully requests the Court grant the following relief.

1.    An order declaring pursuant to 28 U.S.C. § 2201 that Minn. Stat. § 216B.246 is unconstitutional because it violates the Dormant Commerce Clause, and is therefore invalid and unenforceable, to the extent it grants incumbent transmission owners the right of first refusal to build transmission lines in the state of Minnesota.

2.    An order enjoining Defendants from enforcing Minn. Stat. § 216B.246.

3.    An order awarding Plaintiff the costs and expenses incurred in the instant litigation, including its reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b).

4.    An order for such other relief and further relief as may be just and appropriate under the circumstances.

Dated:  September 29, 2017        LOCKRIDGE GRINDAL NAUEN P.L.L.P.


s/Charles N. Nauen
Charles N. Nauen, #121216
David J. Zoll, #0330681
Rachel A. Kitze Collins, #0396555
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:     (612) 339-6900
Fax:    (612) 339-0981
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com

**ATTORNEYS FOR PLAINTIFF
LSP TRANSMISSION HOLDINGS,
LLC**